Frank is here for Appellant Green. Corey Laffer is here for Finkelstein. Mr. Frank, you may begin. Thank you. I'm Patrick Frank on behalf of the Appellant Ruby Green. May it please the court. The issue that presents to the court today is, the main issue, is the granting of summary judgment by the Southern District Court with respect to, on behalf of the defendants, with respect to Ruby Green's 1983 claim for infringement upon her First Amendment free speech rights. In the context of the granting of the motion for summary judgment on behalf of the defendants, the District Court in this instance relied on two lines, two points of reasoning. The first thing is that the District Court determined that the plaintiff had failed to show that the issues raised in the speech in question, the particular speech in question at issue being an August 8, 2020 podcast, a campaign event for Ms. Fender. She had made various statements. They've been identified in the pleadings. I think there are eight discrete statements that were made regarding various issues including … There were more than that. Her position is, your position is that summary judgment, you've got to look at the ones that were labeled the designated statements. That's correct. She made many more than those designated statements, right? There are like over ten of them. As far as I was able to count, 12 or 13 of them. Yes. We provided the entire transcript, but we were focusing on for the purpose of identifying the particular areas of public concern that triggered 1983 protection. We had identified those eight statements, I believe. Now, the District Court said, Mr. Frank, that although you had identified the statements in question, you had not or Ms. Green had not provided any authority to explain why the comments constituted or implicated issues of public concern. In your brief on appeal, there really isn't much discussion of the argument that, for example, talking about funding, keeping experienced attorneys and morale might be a matter of public concern or might touch upon a matter of public concern, but there's a fair amount of case law out there on what creates the dividing line. That seems to be missing from her submissions. Could you address that for me? Absolutely, Your Honor. To make the distinction, because I do believe it's important, there are two parts to this order that is on appeal. There's our motion for partial summary judgment as to liability, and there's the defendant's motion for summary judgment that was granted. The portion that you're citing to the argument or the reasoning that the court relied upon suggesting that we hadn't raised that issue of public concern . . . No, no. It's not that you didn't raise the issue. The District Court said in its order that you had not explained, through citation of cases, authorities, et cetera, why these were statements that implicated matters of public concern. You did raise the issue. She just thought that . . . The District Court thought that you had not sufficiently explained why you prevailed on that issue. That's my question to you. Yes, Your Honor. To be clear, I want to draw that distinction because it's a very important distinction for the purposes of the argument today. That point raised by the District Court was with regard to whether we had made a prima facie showing to demonstrate entitlement to the partial summary judgment. When we switch to the court's analysis on the motion for summary judgment that the defendants brought, there are several important points as it relates to the authority. One is that the District Court itself, at the end of the opinion, acknowledged that the issues that Ms. Green spoke about bearing upon training of public defenders, assistant public defenders in the Broward County Public Defender's Office, the ability to march in solidarity with Black Lives Matter, disparate treatment of minority criminal defendants in the criminal justice system. The District Court judge, at the end of her opinion, when she granted summary judgment in the latter portion, she acknowledged that those were issues of public concern. Yes, but not all of them. Right. She didn't say all, but this is what she focused on. She acknowledged that what the District Court judge focused upon, she utilized or availed herself of the analysis in Connick v. Myers. For lack of a better description, she rebranded some of the statements that Ms. Green made as more akin to employee grievances and things that Ms. Green just didn't like about the way that the office was run. It's interesting the way that the District Court analyzed this within the context of Connick v. Myers, because I'm sure the Connick v. Myers is a similar situation to the extent that it was, I believe it was an attorney in a public defense, no, a state attorney's office, I believe, who circulated a questionnaire. Almost all of the questions in the questionnaire were related to actual employee grievances, the hours, the way that the office was managed. The difference here, I believe, that needs to be brought or emphasized is that Ms. Green focused expressly and spent a lot of time and allocated a lot of her comments to the training of public defenders. Why is the training of public defenders that they're adequate? The court tried to characterize the training of public defenders as a personal grievance that Ms. Green had, that she wasn't being allowed to properly train the people in her charge. If you look at the actual transcript of what Ms. Green said, and I can point you to it, it's tab 41, page 5. She said that she was not allowed to go into the courtroom to train attorneys under her supervision. She did say that, and she followed up by saying that is a concern because it creates the implication that there's not a level playing field between the state attorney's office and the public defenders by virtue of the fact that the public defenders, and she points this out in great detail, she said, how would you feel if you're facing the potential of life in prison or a felony, and you are being represented by someone who's never tried a case in felony court, and the disproportionate impact that has because most, candidly, most of their clients are ascribed to the minority community. How do you, in the balancing at the end of the day, how do you deal with the comments that were, to put it in neutral terms, comments on Mr. Finkelstein himself? Well, as I pointed out in our response to their motion for summary judgment, I think it's worthy of note that a lot of these comments that were made were more, I think some were attributed to Ms. Green when they were actually cross-talked with the Adam Some of them were not. I mean, she said that Mr. Finkelstein comes to work once or twice a week for maybe an hour or two at a time, but doesn't do anything, doesn't know people's names, doesn't go to do jail visits, has no cases. She said that, right? She did say that. Played golf, used drugs. She did say those things. Yes, she did. So, I mean, how can we say that the balancing took tips in her favor? I mean, assume that this was not a campaign to replace Finkelstein, or I think that's Finkelstein or Finkelstein. Assume it wasn't a campaign to replace him. So assume that he's going to still be there, right? Does the First Amendment require him to keep someone on the staff that goes on a radio program, podcast, radio program, and says that he does drugs and doesn't work and plays golf all the time and is a horrible boss? And how does the balancing work? Well, I think you're raising two issues, the balancing and the causative element there. First of all, no, I don't think that they're required to keep a person on necessarily. But the issue that presents here is that what we have are... Why are they required to keep that person on? I mean, so one of my law clerks could go on a radio program and say that I'm on drugs all the time and I don't do any work, I don't show up, and I have to keep that person on my staff because it would violate their First Amendment rights if I hired them. Given that limited example, I don't think you would have to necessarily keep that person on. But the example you gave, respectfully, does not include all of these other issues. All of these other issues of public concern that are raised and intermingled with... No, I'm giving you... It would be of great public concern if there were a federal judge who was on drugs, who didn't do any work, who golfed all the time. That would be of great public concern. But the example you've given doesn't contemplate a clerk speaking to the... The example that you just proffered is a scenario where somebody just got up and said defamatory things about your person, and it wasn't mixed in or intermingled with issues of public concern. No, I'm saying those are public concern. That's the effect. But what I'm saying is the example you said is just someone getting up and saying negative things about you, but not raising. You're saying it would be an issue if they raised those, but they're not saying things about issues that implicate public concern. The net effect, if it were true, would be an issue of public concern. I'm trying to draw that distinction. And when you have a scenario where you have mixed statements, some of the statements may be actionable termination-wise within Mr. Finkelstein's discretion. But the issue here is I think that the district court usurped the fact finder's ability, meaning that a jury in this instance, I would respectfully submit, gets to decide because we know Mr. Finkelstein has admitted that these comments, all of them, offended him professionally and personally. We know, and for the purpose of their motion for summary judgment, they conceded causation. So the issue is what comments specifically resulted in the decision to terminate? And that's a question of fact for a jury to determine, whether it was 10 percent. Isn't the issue whether or not the court correctly employed the Pickering balancing test? Absolutely. And with respect to the Pickering balancing test, and I'm glad you brought that up, the cases and the authority relied upon in this context for the proposition that all you have to do with regard to showing that the potential disruption of the efficiency of an office, a public entity, all you have to do is say, I felt like things were different. I had a self-serving perception that people were looking at me funny. I had hairs on the back of my neck because I felt like things, the scenario, the atmosphere in the office was different. That's not enough to, and that does not augur a reasonable possibility of harm under the Pickering test. I'll note. Mr. Frank, you've reserved some time for rebuttal. I did. Way over your time. We've got your argument. Thank you. Okay. And now we'll hear from Mr. Finkelstein. Good morning, Your Honors. Cory Laufer on behalf of the appellees, Howard Finkelstein, both in his individual capacity and as the public defender of Broward County and the office of the public defender for Broward County. Your Honors, the lower court got this right. They got it right when they granted summary judgment. They got it right when they, when the lower court stated that this is the quintessential employee speech case where the threshold public concern concern framework set forth in conic controls, and Your Honors were focusing on that issue. That is, that is the right issue to speak of. The undisputed facts from the lower court case applied to the clear law of the 11th circuit led to the proper decision. There's, there's a few issues that were glossed over that need to be. There were, there were the, did the district court correctly conclude that some of her statements implicated matters of public concern in our motion judge? I think we thought it was six were not public concern to where the court did five and three. So it was close. So yes, the lower court was correct that a certain portion of those eight statements needed further constitutional analysis via Pickering. It was done properly and the right conclusion was reached. And to come to that conclusion, we have to look at who the actors are here. It's important to note that Howard Finkelstein is the public defender and that Ruby green is a subordinate attorney. That's important because per Pickering and its progeny, the government is going to be given a wide bit of deference as the employer more so than as the special relationship. Doesn't the first amendment though offer its fullest protection for campaign related speech? Generally speaking, there's a low bar. There's a pretty low bar for campaign speech. Generally speaking. Yes. And the court took that into consideration. However, what the court said was you can't cloak campaign speech generally as to every statement. It should be noted. Howard Finkelstein was not running for office. He was attacked on this podcast, even though he was not a candidate. The appellant could have easily said, I'm going to be the best public defender. I'll be in the office all the time. I'll know everybody's names. I'll keep my own cases. How should we take into consideration the fact that he was unable to identify how any of her statements impacted the office? In fact, didn't his deputy testify that the statements did not impact the office? No, the deputy stated that from her perspective, it didn't, it didn't affect her. The lower court called that speculation. And that's correct. Because when we're talking about their evidence in the record that her statements impacted the office, are there, is there evidence in the record from Mr. Dowski as to whether she said the statements impacted the office? There is none. The evidence comes from Mr. Finkelstein, just like it did in the Snipes case, just like in Snipes, where the employer, based on his years and decades of experience in public service, predicted what might happen if they didn't fire the employee. And the court in Snipes said, you don't, not only do you not need the actual harm in Snipes, they had the reasonable prediction from the employer, but Snipes went further. Snipes said it is plainly obvious that we can't, that the employer couldn't keep that, that plaintiff on as an employee, as Judge Brasher was speaking. Can I ask you a question about that? Because I, to me, to me, the wrinkle in this case is that your client wasn't going to be the public defender anymore. So, you know, these comments were about her boss at the time, but she was not going to have to work in the office under that boss anymore going forward when she was terminated. So that's the wrinkle to me. It seems like if, you know, I guess I'll just say I think the Pickering balancing test clearly comes out in your favor if, if it's, Finkelstein is still the boss and she's working under him. But what about the fact that he's on his way out and she said negative things about somebody who's not even going to be there anymore? Mr. Finkelstein had garnered a great deal of respect in the community throughout his career and that was in jeopardy. His record testimony is that for the four or five months that remained, that these statements would be like a disease in the office and he would have to literally monitor this, this employee and see what she was saying and counteract it. Four or five months can be a long time when you can't do your job because you're, you have, you have a completely disharmonious relationship with that employee. And remember what, what the Shahar case talks about. It talks about the highest level of deference given to a government employer when you've got a lawyer and a subordinate lawyer. The reasonableness standard is frankly, your honor, so low. It talks about the fact that, that the employer has to, to be in the wrong. They have to definitely be beyond the range of the reasonable assessment of facts. That's as low as a burden as one can get. And when, for, for Pickering balancing purposes, when is a jury question created? A jury question is created only if any of the statements survive both prong one, public concern, and prong two, the Pickering balance where some constitutional protection is afforded. If that, but that, but that happened here and you agreed that it happened here. No, sir, it did not. You, you told me at the very beginning that you had agreed in the lower court that there were two statements that implicated matters of public concern. That's only prong one. What's prong two? Prong two is the Pickering balance. My, you can't answer a question with a question. My question to you is when is Pickering balancing a jury question? My apologies, I misunderstood. It is not. It is Pickering balancing is completely an issue of law for the court to decide. Never. It's never a jury question. Never a jury question. Okay. The jury only gets involved if something survives prong one and two, and then we have to get into motivating or substantial state. You know, what was the motivation behind the employer? But no prong, prongs one and two are squarely within the confines of the court. And the lower court was, well within its rights to rule as it did. So the Shahar case, if I may, sets forth, again, the highest burden in this case. The, the, the lawyer and subordinate lawyer, they have to, it goes beyond even the special relationship that is discussed where you've got an employee who deals with confidential information or who speaks on behalf of the employer. All that exists here, but the Shahar case is important. It takes it to the next level. And it says when it's two, when it's a superior lawyer and the subordinate lawyer, they have to literally work in harmony. It can congruently that absolutely did not happen here. It's, it's actually based on the statements. It's a, it's a contemptuous relationship. That can't be, there's just, let me play devil's advocate for you for a minute. And this doesn't portend about how the pickering balancing plays out in the end, but going back to one of the scenarios that Judge Brashers sketched out for Mr. Frank, saying that an official like a public defender or a state attorney isn't coming into work, is playing golf, doesn't have any interest in doing any job related duties. That that's a matter that implicates a matter of, it's also a personal attack, but it also implicates a matter of public concern, doesn't it? It, it could, the, the, what the case law talks about is when you judge whether something's an issue of public concern, you need to look to the motivation of the speaker and basically going back to Connick versus Meyers. That can't be the only test. And Connick, Connick says content, form, and context, right? So if you're attacking your boss in the break room with a fellow employee, that's probably not a matter of public concern. But if you're on a political podcast broadcasting to the world, that seems like the context and the, the form of it suggests public concern. Well, what, what Connick said was it talks about the fact that Meyers did not seek, Meyers being the, the employee, did not seek to inform the public that Connick was not discharging responsibilities, nor did she seek to bring to light wrongdoing or breach of the public trust. So it's not just, hey, I don't think you're doing this. How, if her statements were taken as true, how can that not create a breach of the public trust that you have the person who is in charge of public defender services in a relatively large county in Florida, not reporting to work, using drugs and basically spending a lot of his idle time playing golf? Well, to be clear, I don't think she was saying that she was using drugs at the time she was talking about past, but that he wasn't right. So the comments were basically, he's not working enough. He doesn't align the chess pieces on the board the right way. I think there should be more emphasis on training, less emphasis on, more emphasis on training in the courtroom and not in training sessions. That's just internal matters of how do you, what I call aligning your chess pieces. That's not her decision. That's Mr. Finkelstein's decision. No one claims that's not his decision, but it's one thing to be accused or charged with mismanagement of an office. He's putting too much emphasis on the misdemeanor division. He's not trying to keep enough senior attorneys on board. His hiring has been, you know, scattershot, but it's a very different thing to say he's not showing up. He's coming in one or two days a week, one or two hours at a time. That's about four to five hours a week for the public defender of Broward County. Her actual testimony was that she knew of no wrongdoing that he had done. She didn't report him to anyone that would have been the proper channels. And her testimony was she didn't know what Mr. Finkelstein did in the times that he wasn't in the office. Yeah, so she was just making this stuff up on the podcast, I think is what she was suggesting. She was, which means it has virtually zero weight whatsoever. The McCullers case talks about when you make a statement like this and it's not an informed decision, it gets even less weight in pickering. There were no facts here, nothing. These were empty allegations. In fact, in our motion for summary judgment, we literally put forth the breakdown of, the racial breakdown of attorneys in the office and the public defender's office far exceeded the workplace in that respect. There was just, I mean, you know, judges try to put things in boxes sometimes to try to sort of understand them and scheme out how an issue moves through the adjudicative process. And it's one thing to say that a flat out lie is not protected because it's a lie. It's quite another thing to say that that statement which ends up being a lie is not about a matter of public concern. If, okay, let me ask you this. If there is a claim that either a public defender, the public defender or the state attorney for a particular county in Florida is taking bribes to fix cases, does that implicate a matter of public concern? It does. And I don't think that Gulf... What happens if the allegation is false? Does that mean that it's not a matter of public concern or that it doesn't get protection at the end of the day because it turns out to be false? It gets far less protection. If it's completely false in that respect, it gets zero protection. Because it's false. Because it's false. But it still implicates a matter of public concern at the front end of the analysis. But the pickering would be different because the pickering analysis would be, I'm not firing you because you alleged the bribe. I'm firing you because you lied about it. Absolutely. Pickering would be less than zero. It would be wiped out. But Judge Jordan, what I believe Your Honor is saying is that the time in the office is akin to the taking of bribes and whatnot. I don't think that's the case and I don't think that's... I'm not trying to equate one with the other. I think it goes more to how Mr. Finkelstein ran his office. He ran an office where he didn't put enough emphasis in training. He wasn't physically seated in that office enough. He didn't know people's names enough. That's just like Connick. That's just like... It's not like Connick at all. In Connick, the employees sent a questionnaire around to fellow employees, right? That was the context and the form of the communication where the Supreme Court said, well, that's not a matter of public concern. Here, the form and the context is going on a radio show and raising these issues for public consumption. Doesn't that have to be different? It's different in that respect, but case law states that a public employee may not transform a personal grievance into a matter of public concern by invoking supposed popular interest in the way the institution is run. And that's what she's doing. You're not physically in the office enough. You're not allotting enough time for training. Those are things where the questionnaire in Myers was, do you want to be transferred from one division to another? That was the genesis of everything in Connick. Myers didn't want to go from her division to another division. And the court even said, well, it's posed in the form of a questionnaire, but really what you're really doing here, Myers, is you're really trying to generate support for your position, which is you don't want to be transferred out to whatever division she was going to. Can I ask you to... I just want you to address something before you sit down that the other side said. I take it from opposing counsel that they're making an argument, something like this, that okay, let's just assume that under Pickering, an objective boss could have had a good reason to fire this person because of the statements. And then they sort of assume that, but they seem to be saying the public defender didn't do it because he was a good boss objectively looking at the statements. He did it just because he was subjectively upset that someone had said something mean about him. Is that something... Let's assume they're making that argument. They do... If that does matter to Pickering, is that a jury question? I just don't see where that has any relevance towards the analysis, because if Mr. Finkelstein was so above it that he just figured, I'll just take it on the chin and just go forward, he still would be in his right if he so chose to terminate the employment, especially given the low bar, the low threshold as to what is reasonable for his reasonable prediction, his reasonable belief. It's a low bar according to Snipes and Shahar. I just think if it's at... The employee serves at his pleasure. And like Snipes says, it's just obvious that you can't continue with the employee-employer relationship that way, especially when it's lawyers working in concert. She's signing his pleadings. She's representing his clients. She's got the confidential information of the clients. I mean, that is just... The need for the harmony and the congruity is so important in that aspect that it just seemingly overrules almost everything, even if there wasn't anything else, and there is. Thank you. Thank you, counsel. Thank you, your honors. Can I just ask you to address that on the Pickering issue, so I'll just say, let's assume that all of these statements are matters of public concern. It seems like your argument is that the subjective mindset of the public defender is what matters. One, is that what you're arguing? Two, if it is what you're arguing, what basis do you have to make that argument? I think that that's an offshoot of the argument, but I think objectively, under the Pickering test, the language used in Pickering is what's key here as it relates to the evidence in this case, or the lack thereof. It says, reasonable possibility of harm. And the two cases that the district court judge relied upon in this context are the Pickering case and the Snipes case. And in those two cases were extreme examples. For instance, McCullers, clerk of court, somebody who worked for the clerk of court said that the state attorney should die because the state attorney didn't pursue the death penalty against somebody. Resulted in the courthouse being laid siege to. They had to hire more people to answer telephone calls and complaints. Clearly, that is an example of disruption of the efficient operation of an office. Snipes, the Volusia County, that dealt with the beach patrol for Volusia County. And the issue that came up in that case was the person who, and this relates to the Trayvon Martin case, when George Zimmerman was acquitted, someone who worked for the beach patrol said, went on Twitter and said, good riddance, or something to the effect of good uproar. And they terminated this guy for saying this on Twitter. And the court determined that it was a disruption. Why was it a disruption in this context? It was a disruption because on the record, Volusia County's beach patrol department was engaged proactively in a minority outreach program to recruit minority employees. And of course, having somebody who again, you have another just stark example of something that's going to disrupt the efforts of the activities or the efficient operation of the office. What we have here, but the distinction here, I think that's very important, is that it's the reasonable possibility of harm. It's not the reasonable belief. It's not the belief. And that's where the subjective component comes in, Your Honor. It's not having a reasonable belief that something might happen based on whatever your predisposition is or whether you personally heard about something does not put anything on your side in the pinkering balance. In this instance, the record reflects Mr. Finkelstein was asked over and over and over again, tell me, give me a witness, give me, identify a witness who can say that anything in the office has changed. Tell me of an exchange, give me an anecdote of anyone who's come to you and said they just feel differently about you. See, that seems kind of odd to me because if that were the burden, then it would be the government's obligation to allow the employee to sort of stay there for a while and generate a problem post-speech. Is that what you're suggesting? No, I'm not suggesting that. I'm just saying that. How else could the government come up with the evidence that you're suggesting the government needed to present? I'm not saying that the government needs to come up with any evidence. I'm saying that they need to point to something. In terms of conjuring evidence to meet that burden, you should be able to objectively point to something that a reasonable person would look at and say, you know what, this is something that could reasonably lead to the disruption in office. All right, here's, I want you to respond to this quote from a case from us called Morris. This is our case. We said this quote, the First Amendment does not require a public employer to tolerate an embarrassing, vulgar, vituperative ad hominem attack simply because the employee recently has waived a political sign or was waiving the sign while conducting the attack, end quote. Is that, how is that not directly relevant to what we're talking about today? It is relevant, and I think this came up in the district court's opinion by virtue of the fact that they suggested that we were making the claim that Ms. Green was entitled to some manner of absolute immunity by virtue of the fact that it occurred during a campaign event. And as I conceded to you, your honor, earlier, yes, there are scenarios where someone makes, says something that is offensive, where they would have the right to do that. But when you mix, but it becomes more of a complicated issue, I think, when you mix it in, when you don't have the isolated statements that you used in your example earlier, where it is mixed in within the context of a campaign event. I mean, is this, I mean, I guess the question for me is, is this an embarrassing ad hominem attack? I don't, if you're asking what I think personally, I don't consider it to be an embarrassment. Well, as a lawyer, I mean, is it, I mean, is when we, when we said in that case that a public employer is not required to tolerate an embarrassing, vulgar, vituperative ad hominem attack, I mean, are we talking about something like this? Like somebody going on a podcast and saying their boss is a drug, does drugs and coughs all the time and doesn't show up and is a racist? I think given the fact that Mr. Finkelstein is a politician and has run this office, I think that is, is mild by comparison with other things that have happened over the years. I do not consider that vituperative. If I may, there was one question I wanted to directly address Judge Wilson. You had asked my counterpart, the question about Renee Dodowski, and you had asked whether Dodowski had disavowed any change to the office earlier. My counterpart answered the question by saying there was no change for Ms. Dodowski, but I wanted to clarify the record. The, I'm reading from Ms. Dodowski's deposition. I asked her, do you know if the statements made by Ms. Green had any impact one way or another on the actual operation of the office? And she said, no, I don't believe so. Well, this wasn't a dis, there wasn't a distinction there in which Ms. Dodowski said it didn't affect. You don't have to, but you don't have to show actual disruption, right? Under our case law. No, you have to show possibility of disruption or, or, and, but belief but, but, but belief, subjective belief doesn't, doesn't cut it on the case. You're taking the action, you're taking the action at a certain point in time. It's whether or not there is a reasonable possibility of disruption at the time that you act, right? At the time that you act, yes. You, so nobody has a crystal ball to know whether it will or it won't. The question is, I don't, I don't want to take a chance on this being a problem in the earlier. He said that, you know, this was a scenario where Finkelstein was leaving the, the, the, not that he still, but he still had months there. You still have to run an office with individuals who are being charged with crimes and whom you have to provide representation to. Absolutely. But I think the contention, Mr. Mr. Finkelstein's contention that there was going to be imminent disruption, I think is a bit, is, is contained some measure of hyperbole. I don't think that was a reasonable argument that, well, when people hear these comments on this podcast, they might, lawyers might decide not to apply to be assistant public defenders. They know that this is how the office operates. That's a discourage, discourage lawyers from wanting to work there. I don't think Mrs. Green, Ms. Green's intention was to discourage lawyers to work. I think she was talking about how to improve it so that they could encourage more lawyers to work there. I love your argument. Thank you. Thank you.